GILBERT HAYES *v.* MARK J. DECKER
(AC 20918)

Foti, Spear and Flynn, Js.

Argued June 11—officially released October 16, 2001

*Gary J. Strickland,* for the appellant (plaintiff).

*Lorinda S. Coon,* with whom was *Paul T. Nowo-sadko,* for the appellee (defendant).

*Opinion*

SPEAR, J. In this medical malpractice action, the plaintiff, Gilbert Hayes, appeals from the judgment of the trial court, rendered after a jury trial, in favor of the defendant, Mark J. Decker, a physician. He claims that the court improperly granted the defendant's motions (1) to exclude scientific testimony and (2) to preclude evidence of a commonality of insurance interests between the defendant and the defendant's expert. We agree with the plaintiff's first claim and reverse the judgment of the trial court.[1]

---

[1] In light of our reversal, we do not review the plaintiff's second claim. Although this issue is likely to arise in the new trial, the record is inadequate for review. *State* v. *Talton,* 63 Conn. App. 851, 861, 779 A.2d 166 (appellant must provide record adequate to review his claims), cert. denied, 258 Conn.

The following facts and procedural history are relevant to this appeal. On May 12, 1995, the plaintiff, who was fifty years old, went to the defendant, an internist, for a physical examination. During the examination, he reported sexual dysfunction and multiple cardiac risk factors, including age greater than forty, high cholesterol, overweight, chest pain, smoking, and a family history of vascular disease and hypertension, for which he was taking Procardia XL as prescribed by his kidney physician. The defendant suggested that the plaintiff lose weight to control his blood pressure and that he stop taking Procardia for a trial period as a possible solution to his impotence problem.

By the time of his next visit to the defendant's office on June 2, 1995, the plaintiff had lost fifteen pounds and his systolic and diastolic blood pressure reading had dropped from 160 over 110 to 120 over 90. The defendant again suggested that the plaintiff stop taking Procardia as a possible cure for his impotence. The defendant did not consult with the plaintiff's kidney physician before making this recommendation and did not prescribe any substitute blood pressure medication, as he apparently believed that the plaintiff's blood pressure could be controlled adequately by weight reduction and exercise. Approximately one week later, the plaintiff stopped taking Procardia. Two weeks later, his blood pressure reading was 140 over 95.[2]

On July 9, 1995, the plaintiff suffered a massive heart attack. During the attack, his diastolic pressure rose to

---

907, 782 A.2d 1250 (2001). Even if we were to agree that the court improperly excluded the evidence of insurance interests, we cannot determine whether such exclusion was harmful because the relevant transcripts of testimony by the defendant's three expert witnesses are not included in the record or court files. Without the relevant transcripts, we cannot assess whether the disputed expert testimony was merely cumulative or whether it was likely to have affected the result of the trial.

[2] This information was contained in a report dated August 22, 1995, by Arthur Landry, Jr., a physician who examined the plaintiff after his heart attack.

120. At the hospital, he underwent catheterization and primary angioplasty. In performing this procedure, physicians discovered that his left anterior descending artery was totally occluded and that there was significant stenosis of the right coronary artery. Two months later, the plaintiff underwent triple bypass surgery.

In his complaint dated June 30, 1997, the plaintiff claimed that the defendant negligently failed to recognize and treat symptoms of cardiac ischemia and permitted him to discontinue the Procardia without substituting another blood pressure medication. The case was tried to a jury, which returned a verdict for the defendant. Thereafter, the court denied the plaintiff's motion to set aside the verdict and rendered judgment for the defendant. This appeal followed.

The plaintiff claims that the court improperly excluded testimony that the discontinuation of his blood pressure medication increased the severity of his heart attack. We agree.

At trial, the defendant filed a motion to exclude proposed testimony by the plaintiff's expert witness, Richard Friedlander, pursuant to *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997) (en banc), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998). Friedlander was a board certified physician in internal medicine and cardiology who had treated hundreds, perhaps thousands, of patients during his career, and who at one time directed cardiovascular clinical research for a pharmaceutical company. At the hearing on the motion, Friedlander stated his "belief" and "opinion" that, although the discontinuation of the plaintiff's blood pressure medication did not cause his heart attack, it did cause his blood pressure to rise and resulted in more tissue damage than otherwise would have occurred had he not stopped taking the medication. Friedlander based his opinion on the fact that

numerous studies show, and it is generally accepted within the scientific community, that an increase in blood pressure results in an increase in the demand of heart muscle tissue for oxygen, and that increased blood pressure and oxygen demand during the acute phase of a heart attack result in increased tissue death. He also testified that studies have shown that Procardia, a well known blood pressure medication, lowers blood pressure in most individuals.

Friedlander acknowledged, however, that he did not know of any research or completed study[3] documenting a link between the discontinuance of blood pressure medication and an increase in the severity of a subsequent heart attack. He also could not point to any scientific articles, studies or treatises concluding that specific increases in blood pressure result in specific amounts of heart muscle damage. He testified that such studies would be impossible to conduct because "you are comparing what is to what would have been" in a single heart attack patient. Moreover, he did not attempt to quantify how much additional heart muscle damage the plaintiff might have suffered as a result of discontinuing his medication.

The court "reluctantly" ruled, on the basis of the standard articulated in *Porter* for the admissibility of scientific evidence, that because there was no study concluding that the withdrawal of Procardia will increase the severity of a heart attack, Friedlander's proposed testimony was "speculative" and hence inadmissible. In denying the plaintiff's subsequent motion to set aside the verdict, the court similarly stated that, in the absence of any evidence in the form of treatises or publications establishing that the withdrawal of Pro-

---

[3] Friedlander testified that he had participated as a research fellow in a study of the use of nitroglycerin to reduce the size of a heart attack, but that the study was never completed.

cardia increases the severity of a heart attack, it saw no reason to change its opinion.

As a threshold matter, we set forth the standard by which we review the trial court's determinations concerning the admissibility of evidence. "A trial court's ruling on the admissibility of evidence is entitled to great deference. . . . [T]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and . . . evidentiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of a substantial prejudice or injustice." (Citation omitted; internal quotation marks omitted.) *State* v. *Jordan*, 64 Conn. App. 143, 154, 781 A.2d 310 (2001).

"Concerning expert testimony specifically, we note that the trial court has wide discretion in ruling on the admissibility of expert testimony and, unless that discretion has been abused or the ruling involves a clear misconception of the law, the trial court's decision will not be disturbed." (Internal quotation marks omitted.) *State* v. *Wargo*, 255 Conn. 113, 123, 763 A.2d 1 (2000).

"In *State* v. *Porter*, [supra, 241 Conn. 66–68] . . . [our Supreme Court] adopted the standard for admissibility of scientific evidence as set forth by the United States Supreme Court in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 587–89, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) . . . .

"Under *Daubert*, before proffered scientific evidence may be admitted, the trial court must determine whether the proffered evidence will assist the trier of fact . . . . This entails a two part inquiry: whether the reasoning or methodology underlying the [scientific theory or technique in question] is scientifically valid and . . . whether that reasoning or methodology properly

can be applied to the facts in issue. . . . In other words, before it may be admitted, the trial judge must find that the proffered scientific evidence is both reliable and relevant. More specifically, the first requirement for scientific evidence to be admissible . . . is that the subject of the testimony must be scientifically valid, meaning that it is scientific knowledge rooted in the methods and procedures of science . . . and is more than subjective belief or unsupported speculation. . . .

"The [*Daubert*] court listed four nonexclusive factors for federal judges to consider in determining whether a particular theory or technique is based on scientific knowledge: (1) whether it can be, and has been, tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error, including the existence or maintenance of standards controlling the technique's operation; and (4) whether the technique is, in fact, generally accepted in the relevant scientific community. . . . The court in *Daubert* further articulated, however, that the inquiry is . . . a flexible one. . . . To the extent that they focus on the reliability of evidence as ensured by the scientific validity of its underlying principles, [other factors] may well have merit . . . .

"Under *Daubert*, scientific evidence must also fit the case in which it is presented. . . . In other words, proposed scientific testimony must be demonstrably relevant to the facts of the particular case in which it is offered, and not simply be valid in the abstract. . . . Finally, the *Daubert* court emphasized that even if a scientific theory or technique would be admissible under the aforementioned criteria, it can still be excluded for failure to satisfy some other federal rule of evidence. . . . Most important, proffered scientific testimony can still be excluded for failure to satisfy rule 403 of the Federal Rules of Evidence, which allows for the exclusion of relevant evidence if its probative

value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Kelly*, 256 Conn. 23, 72–74, 770 A.2d 908 (2001).

We conclude that the court incorrectly applied the law as set forth in *Porter*. Friedlander's testimony as to whether the discontinuation of the plaintiff's blood pressure medication increased the severity of his heart attack should have been considered under the standards for the admissibility of expert opinion testimony; his testimony on the well documented effect of Procardia in lowering blood pressure and the relationship between blood pressure and tissue damage during a heart attack should have been considered under the standard for the admissibility of scientific evidence under *Porter*, or simply admitted on a showing of relevance. The court never made this crucial distinction and, in applying the *Porter* analysis to Friedlander's opinion rather than to the scientific evidence on which it was based, improperly excluded all of his proposed testimony on Procardia, blood pressure and the amount of tissue damage that may occur during a heart attack.

We turn first to Friedlander's opinion that the plaintiff's heart attack was more severe than it would have been had he not discontinued the Procardia. "Expert testimony should be admitted when: (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues. . . . Furthermore, [t]he proffering party bears the burden of establishing the relevance of the offered testimony. Unless such a proper foundation is established, the evidence . . . is irrelevant. . . . Evidence *is not rendered inadmissible because it is not conclusive*. All that is required is that the evidence tend to

support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative." (Citations omitted; internal quotation marks omitted.) *Daley* v. *Wesleyan University*, 63 Conn. App. 119, 135–36, 772 A.2d 725, cert. denied, 256 Conn. 930, 776 A.2d 1145 (2001).

"An expert witness ordinarily may not express an opinion on an ultimate issue of fact, which must be decided by the trier of fact. . . . An expert may, however, give an opinion on an ultimate issue where the trier, in order to make intelligent findings, needs expert assistance on the precise question on which it must pass." (Citation omitted; internal quotation marks omitted.) Id., 138.

In rejecting the proffered testimony because it was not directly supported by treatises or publications, the court misapplied the law. The fact that Friedlander described his testimony as an "opinion" and conceded that it could not be directly tested because conducting a study on an individual patient would be impossible does not mean that it should not have been considered by the jury. An opinion, by definition, consists of "[e]vidence of what the witness thinks, believes, or infers in regard to facts in dispute." Black's Law Dictionary (6th Ed. 1990). "An opinion is . . . an interpretation of facts . . . ." *Goodrich* v. *Waterbury Republican-American, Inc.*, 188 Conn. 107, 119 n.10, 438 A.2d 1317 (1982). "To allow . . . an expert witness to express his opinion . . . is not error [where the] opinion is premised on subordinate facts and is not based on mere conjecture or surmise." *State* v. *Wallace*, 181 Conn. 237, 242, 435 A.2d 20 (1980). Friedlander claimed that his opinion was based on generally accepted scientific principles regarding the relationship between high blood pressure and tissue damage during a heart attack and the effect of Procardia on blood pressure. According to Friedlander,

these principles have been thoroughly studied and are well documented.

Moreover, "the jury is free to accept or reject each expert's opinion in whole or in part." (Internal quotation marks omitted.) *Amsden* v. *Fischer*, 62 Conn. App. 323, 332, 771 A.2d 233 (2001). "The credibility of expert witnesses and the weight to be given to their testimony and to that of lay witnesses . . . is determined by the trier of fact. . . . In its consideration of the testimony of an expert witness, the trial court might weigh, as it sees fit, the expert's expertise, his opportunity to observe the defendant and to form an opinion, and his thoroughness. It might consider also the reasonableness of his judgments about the underlying facts and of the conclusions which he drew from them. . . .

"It is well settled that the trier of fact can disbelieve any or all of the evidence proffered . . . including expert testimony, and can construe such evidence in a manner different from the parties' assertions." (Internal quotation marks omitted.) *State* v. *Alvarado*, 62 Conn. App. 102, 112, 773 A.2d 958, cert. denied, 256 Conn. 907, 772 A.2d 600 (2001).

Our Supreme Court in *Porter* similarly referred to the "distinction under the *Daubert* approach between the methodologies underlying an expert's scientific testimony and the expert opinion itself. As the court in *Daubert* noted, the focus of a validity assessment must be solely on principles and methodology, not on the conclusions that they generate. . . . So long as the methodology underlying a scientific opinion has the requisite validity, the testimony derived from that methodology meets the *Daubert* threshold for admissibility, even if the judge disagrees with the ultimate opinion arising from that methodology, and even if there are other methodologies that might lead to contrary conclusions. Thus, a judge should admit scientific testimony

when there are good grounds for [the] expert's conclusion, even if the judge thinks that there are better grounds for some alternative conclusion . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Porter*, supra, 241 Conn. 81–82.

To underscore this point, the court pointed to a case from the United States Court of Appeals for the Seventh Circuit, *Cella* v. *United States*, 998 F.2d 418, 420 (7th Cir. 1993), in which a federal trial court permitted testimony by the plaintiff's expert witness that was contrary to the testimony of the defendant's multiple medical experts and the "abundance of medical literature." (Internal quotation marks omitted.) *State* v. *Porter*, supra, 241 Conn. 82. The court quoted *Cella* with approval in concluding that it is not error to admit possible controversial opinion evidence, because "although there was little support in the literature for the physician's specific *conclusion* regarding the cause of the plaintiff's injury, the court found that he had employed a proper and thorough diagnostic *methodology*. Accordingly, it was not error to admit the physician's testimony, because [a]s long as the expert's methodology is well founded, the nature of the expert's conclusion is generally irrelevant, even if it is controversial or unique. . . . Once the methodology underlying an expert conclusion has been sufficiently established, the mere fact that controversy, or even substantial controversy, surrounds that conclusion goes only to the weight, and not to the admissibility, of such testimony.

"Of course, even where a particular technique has been shown to satisfy *Daubert*, the proponent must also establish that the specific scientific testimony at issue is, in fact, derived from and based upon that methodology. The Supreme Court in *Daubert* referred to this concept as the fit requirement. . . . [A]lthough some conclusions can be reasonably inferred from the methodology employed, others cannot. . . . When an expert's conclusions are not commensurate with the

underlying methodology, they may be properly excluded under *Daubert* because they do not rely on scientific knowledge and are thus unhelpful to the jury." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 83–84. Accordingly, the court improperly excluded Friedlander's opinion testimony under *Porter* and never reached the question of whether the underlying scientific evidence and methodology was admissible.

In determining the admissibility of scientific evidence, the court first must decide whether a *Porter* analysis is even appropriate. "In *Porter*, [our Supreme Court] said that '[a]s science and technology have advanced and become increasingly prevalent in our society, the number of cases, both civil and criminal, in which scientific testimony plays a role has also grown.' . . . [Our Supreme Court] explicitly acknowledged, however, that 'some scientific principles have become so well established that an explicit *Daubert* analysis is not necessary for admission of evidence thereunder. . . . Evidence derived from such principles would clearly withstand a *Daubert* analysis, and thus may be admitted simply on a showing of relevance.' " (Citation omitted.) *State* v. *Reid*, 254 Conn. 540, 545, 757 A.2d 482 (2000).

Here, Friedlander proposed to offer scientific evidence that higher blood pressure results in a greater demand for oxygen by heart muscle tissue than lower blood pressure, and that higher blood pressure and oxygen demand during the acute phase of a heart attack cause increased tissue death. He also proposed to offer evidence that Procardia lowers blood pressure in most individuals. According to Friedlander, all of this evidence is well documented and generally accepted by the scientific community. The court below should have admitted the scientific evidence simply on a showing of relevance or, alternatively, conducted a full scale

analysis of its admissibility under *Porter*. We, therefore, conclude that the court not only incorrectly applied *Porter* to Friedlander's opinion testimony, but also *failed* to apply *Porter*, or the relevancy test, to the scientific evidence on which his opinion was based.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.

